THE HARTFORD IRON MINING COMPANY v. THE CAM-
BRIA MINING COMPANY.

*Corporations—Authority of officers and agents—Deed—Boundary line—"Half" defined.*

1. A corporation cannot be held to have contracted unless its offi-
cers or agents who make such contract have express or implied
authority to bind the corporation, and even individual directors
have no power to bind the corporation; citing *Lockwood v.
Boom Co.*, 42 Mich. 539.

2. The word "half," when used in describing lands, should be
construed as meaning half in *quantity*, unless the context or
surrounding facts and circumstances show a contrary intention;
citing *Jones v. Pashby*, 62 Mich. 614; *Heyer v. Lee*, 40 Id. 353;
*Dart v. Barbour*, 32 Id. 271.

   So *held*, where a mining company executed mining leases of
the east half and of the west half, respectively, of a fractional
40 acres of land fronting on a meandered lake, describing the
same as a lot according to the government description, but
with nothing in the context to show that the words were used
in any other than a *literal* sense.

Error to Marquette. (Grant, J.) Argued April 24,
1890. Decided May 2, 1890.

Trover. Plaintiff brings error. Reversed. The facts
are stated in the opinion.

*F. O. Clark* (*W. P. Healy*, of counsel), for appellant.

*A. B. Eldredge* (*D. H. Ball*, of counsel), for defendant.

LONG, J. Prior to December 1, 1875, the Teal Lake Iron

Mining Company was the owner of lot 5, section 36, in township 48 N., of range 27 W., Marquette county, this State.

On that day the company made and executed to James H. McDonald and R. P. Harriman a mining lease of the west half of said lot. By the terms of this lease the second parties were licensed to enter upon the lands, and to dig thereon, and mine and carry away therefrom, iron ore, for the term of ten years, they having the exclusive right of mining and to carry away ore, and the right to erect thereon and maintain such buildings and machinery as might be necessary for the thorough and successful prosecution of said work. This lease further provided that the second parties should not occupy any portion of said lands for the purposes of carrying on any trade, business, or occupation except said mining, or such other work or business as is necessarily incidental thereto. This instrument was duly acknowledged, and recorded in the office of the register of deeds of that county, August 26, 1882. Subsequently, and prior to March 16, 1882, this lease was assigned to the Cambria Mining Company, a corporation, the defendant herein. On March 16, 1882, the lease was extended until December 1, 1895, and the assignment and extension duly recorded.

On June 1, 1887, the Teal Lake Iron Mining Company made and executed a similar lease of the east half of said lot 5 to the Hartford Iron Mining Company, of Milwaukee, a corporation organized and existing under the laws of Wisconsin, the plaintiff in this suit. This lease was to continue in force for the period of twelve years from its date.

This action of trover is brought to recover the value of 5,000 tons of iron ore alleged to have been wrongfully taken by the defendant from the land of the plaintiff. This lot 5 is in the Negaunee iron range, and borders upon Teal lake. The following diagram will show the situation:

PLAT OF LOT 5, SEC. 36, T. 48 N., R. 27 W.

It appears that a dispute arose some time in 1888 between the two companies as to where the dividing line should be located between the *east half* and *west half* of this lot 5; the defendant ·company claiming that the line should be run due north from a point equidistant between the south-east corner and south-west corner of the said lot to Teal lake, and being a line parallel or equidistant between the east line and the west line of the said lot, running due north to Teal lake; that, the south line of the lot divided into equal parts, the line between the two running due north would be the proper and legal subdivision, irrespective of the acreage of land contained in either subdivision. The plaintiff company denied that position, and claimed that the east half was one-half of the acreage in lot 5, and that the line should be run between the east and west lines to Teal lake at such a point as would make an equal subdivision of acreage between the east half and the west half of the lot. The two lines on the above diagram were run by Mr. George P. Cummings, an engineer, the easterly line being at the point equidistant between the corners, and running due north. The other is the line of subdivision of equal acreage.

It appears that Benjamin Neely, in 1884, had an option for a lease of the east half of lot 5, to explore for iron ore. He continued his explorations, and some time in August, 1886, discovered ore at the point marked on the diagram as " Iron Ore Pit." After the plaintiff company was organized, it opened up the ore, and was mining in this pit, when the defendant company took possession from it, claiming to own the ore already mined, as well as the ore in the pit to be mined, and proceeded to take and convert to its own use 5,000 tons of this ore, claimed to be worth from $4 to $4.50 per ton at the pit.

But two questions are raised:

1. Which is the line,—the one that divides the lot into equal acreage, as claimed by the plaintiff, or the one that divides it by a line running north and south from a point equidistant between the two south corners, above referred to?

2. It appears that H. H. Stafford, after he was appointed general manager of the plaintiff company, employed the engineer, Cummings, to run a line between the east half and the west half of this lot, and Mr. Cummings commenced at the point equidistant between the corners on the south line, and ran the east line as indicated on the diagram, and which would come east of the pit where the ore was taken out. Subsequently the plaintiff employed Mr. Cummings, the same engineer, to run a line which would divide the lot into two equal parts as to acreage, being the west line indicated on the diagram, and which runs some distance to the west of the pit of iron ore in question. It is therefore contended by the defendant that, the plaintiff's agent having caused this line to be run, it was an acquiescence in the boundary line at that point, and the plaintiff company cannot now question it.

Some other facts are shown as to the arrangement for the running of these lines; and it is claimed that Mr. Maitland, the agent of defendant company, paid one-half of the expenses of running the east line, and that there was some sort of agreement between the agents of the two corporations that this east line, so run by Cummings, would be satisfactory. There is no showing, however, that the plaintiff company, by any act except that of the general manager, as above, ever made any agreement that this should be treated as the true line of division between the east and west half; and no authority is shown to the agent of plaintiff to make any such arrangement or agreement. A corporation cannot be held to have contracted unless its officers or agents who make such contract have express or implied authority to bind the corporation, and even individual directors have no power to bind the corporation. *Lockwood v. Boom Co.,*

42 Mich. 539.   There is no force in the second proposition, and it need not be discussed at length.

The rights of the parties must, therefore, be settled by a construction of these two mining leases, as to where the true dividing line is to be found,—whether by equal distances from east to west or by equal acreage.   In *Au Gres Boom Co. v. Whitney*, 26 Mich. 42, it appears that a very similar question arose.   The land was bounded on the west side by the Au Gres river.   This river is not a straight line at this point, and the north line of the land is longer than the south line.   No line between the north and south half was ever agreed upon.   The circuit judge directed such division as would give the complainant in that case one-half of the river front; that is, he made the dividing line one of equal distance from the north and south lines of the lot.   This was held to be erroneous; that the north half must mean the north half in quantity, divided from the remainder by an east and west line.   This ruling was followed in *Dart v. Barbour*, 32 Mich. 271.   It was there said:

"Each deed was for a half of the lot, and, unless we distort the sense, we are compelled to find according to the idea imported by the words; and the idea imported by the words 'half of the lot' is half in quantity."

This rule was again followed in *Heyer v. Lee*, 40 Mich. 353, and the former cases cited.   Again, in *Jones v. Pashby*, 48 Mich. 634, the same question was presented, and the former opinions cited and approved.   But it was said by Mr. Justice COOLEY that—

"There can be no universal rule that the word shall be so interpreted, for it is often used in conveyances when the context indicates a sense quite different.   Two parts of a farm separated by a river or a highway may be called the 'two halves' without much regard to their relative quantity; and in surveys the word 'half' is often used quite as loosely, but without the least confusion.

In all such cases the word must be taken in the sense intended, if that is evident; and, if not, the accompanying circumstances and the subsequent acts of the parties may, perhaps, direct us to the true meaning."

It appeared in that case, however, that the land was so partitioned by mutual conveyances as to make it uncertain where the dividing line lay. A subsequent grantee of one portion built a house on the doubtful strip, and mortgaged it, and the mortgagee went into possession. On the foreclosure, certain persons impleaded as subsequent incumbrancers made it part of their defense that the mortgagee should account for rents and profits; and decree was rendered on that basis. It was held that they were thereafter estopped from bringing ejectment for the disputed strip as grantees from the adverse claimant. Again, in *Jones v. Pashby*, 62 Mich. 614, Mr. Justice CHAMPLIN, speaking for the Court, held that the word "half," when used in describing lands, should be construed as meaning half in quantity, unless the context or surrounding facts and circumstances show a contrary intention; and in support of this doctrine he cites *Au Gres Boom Co. v. Whitney, supra, Dart v. Barbour, supra,* and *Heyer v. Lee, supra.*

Counsel for defendant, however, while not disputing that the rule has been fully established and settled by these cases as to the construction and interpretation of the words under the circumstances stated in those cases, contend that there are circumstances appearing here which plainly distinguish this case, on principle, from those; that the Teal Lake Company, the licensor, was, by virtue of its ownership of lot 5, also the owner of a large quantity of land under Teal lake, and which land is a part of lot 5, and would pass by a conveyance of it, —that is, that lot 5 embraces all the land included within its east and west lines, extended north to the

center of the lake; that iron ore is a rock and a part of the formation of the country, and is found, dipping with the rocks, in lenses and veins; that it does not usually lie in perpendicular deposits, but, like nearly all other minerals, inclines with the surrounding rocks, so that, not infrequently, if found on one 40-acre tract, its dip will carry it onto an adjoining tract at greater depth; that the mining laws of the United States are framed with reference to the well-known facts of the dip of ore formations, section 2322 of the Revised Statutes providing that all locators of mining claims shall have the exclusive enjoyment of all veins, lodes, or ledges throughout their entire depth, the top or apex of which lies inside of the surface lines of said claims, although such veins, lodes, or ledges so far depart from a perpendicular course downward as to extend outside of the vertical side lines of such claims.

That by the terms of both licenses the parties to this suit were entitled to enter, the one upon the east half, the other upon the west half, of lot 5, and to dig thereon, and mine and carry away, iron ore, and that, beyond this right to mine ore, and such occupation as is incident thereto, neither party obtained any rights in any part of lot 5, but, on the contrary, the licensor expressly retained such rights; that when these facts are taken into consideration, and the purposes of the licenses in controversy are considered, the intention of the parties, drawn from the instruments themselves, would seem to be clear that each should take one-half in quantity—one-half in acreage—of all of lot 5 which was or might be useful for the purposes expressed in the licenses, and that it is clear that the whole lot, both the land under the water and the land above the water, is of equal value, of equal use, for mining purposes; and that, therefore, the line of equal distances from the east and west line of the lot,

drawn northward, is the true boundary between the east and west half. That is, counsel contend that the court must take these evidences of extraneous circumstances to aid in the interpretation of the words used in these licenses.

These evidences are never to be resorted to unless there is some ambiguity in the instrument under consideration. There should be interpretation only when it is needed,—that is, only where, without it, the meaning or effect of the contract would be in doubt; and, assuming such need, the rule most conspicuous and wide-reaching of all is that a written contract shall be so interpreted as, if possible, to carry out what the parties meant. There is no possible ambiguity about these descriptions. It is the east half and the west half of a specified lot. The lot and its boundaries are fixed by the government survey. It is bounded upon the south by an east and west line, on the east and west by a north and south line, and on the north by a meandered lake frontage. Lot 5 consists principally of the S. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$ of section 36, taking in, however, a small portion of the land bordering on the lake, on the north 40 acres adjoining. The government description, however, is "Lot 5, section 36," containing 42 and 70-100 acres of land. It is evident that the parties to this controversy, when taking their licenses for mining purposes, and the grantor in the licenses, had reference to lot 5 as platted and located, and as containing 42 and 70-100 acres of land. The literal significance of the word "half" is one of two equal parts into which anything may be divided, and that is the effect of the decisions of this Court above cited. There is nothing in the context which shows that the words were used in any other than a literal sense. The mere fact that the lands were to be used for mining purposes instead of some other purpose cannot vary or

change the rule of interpretation. It may be possible that plaintiff, in following some vein of ore, may find that it extends beneath the waters of Teal lake. There is nothing in the facts and circumstances of this case indicating that it was the intention of the parties to mine under Teal lake, nor is there anything in the case showing that there is any ore under Teal lake. We are not, however, called upon to determine the equities between the parties, but to give construction to the words employed by the parties in making the contracts. These words not only have a literal signification, but had, long prior to these grants, received judicial interpretation.

Under the circumstances of this case and the situation of the premises, had these licenses granted to the parties a north and a south half, then, under defendant's claim, one might have had only a few acres of land outside of Teal lake, and in fact his half might be almost entirely submerged, and of no practical use even for mining purposes; and yet the interpretation claimed by defendant might be as plausibly urged as in the present division.

It must be held that the true boundary line between these two pieces of land is by a line, drawn north and south, dividing the lands into equal acreage. The circuit judge, on the trial in the court below, took a different view of the licenses, and held, as claimed by defendant, that the true line was one to be drawn at equal distance, from the east and west lines, and directed verdict and judgment for defendant.

The judgment must be set aside, with costs, and a new trial ordered.

CHAMPLIN, C. J., MORSE and CAHILL, JJ., concurred. GRANT, J., did not sit.